UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

TROY G. HAMMER,

        Plaintiff,

        v.                                    Case No. 19-C-444

SAMANTHA SCHWARTZ-OSCAR, et al.,

        Defendants.

## DECISION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff Troy G. Hammer, a prisoner who is representing himself, filed this action under 42 U.S.C. §1983, alleging that the defendant correctional officers and staff violated his constitutional rights by failing to prevent him from injuring himself and failing to promptly treat his self-inflicted injuries. The case is before the Court on Defendants' motion for summary judgment, which is fully briefed and ready for the Court's decision. The Court will grant Defendants' motion and dismiss this case.

### BACKGROUND

Hammer was incarcerated at Green Bay Correctional Institution from October 21, 2011, until October 29, 2018. Dkt. No. 73 at ¶13. He is proceeding on Eighth Amendment deliberate indifference claims against Psychologist Samantha Schwartz-Oscar, Lieutenant Daniel Cushing, Sergeant Gregory Friedel, Nurse Stephanie Wijas, and Officers Michael Dedering, Dalia Dedering, Tyler Williquette, and Scott Hansen, Jr., for allegedly failing to protect him from self-harm. Dkt. No. 7. He is also proceeding on medical malpractice claims against Dr. Schwartz-Oscar and Nurse Wijas. *Id.*

At about 6:45 p.m. on July 3, 2017, Cushing reported to the restrictive housing unit (RHU) because Hammer had shown staff a razor and stated that he was suicidal. Dkt. No. 73 at ¶24. After he gave staff the razor without incident, Hammer was taken to a hearing room so Cushing could talk to him. *Id.* at ¶25. Hammer said he wanted to die and would do whatever it took; he told Cushing that staff should just place him in restraints. *Id.*; Dkt. No. 108 at ¶7. Cushing told Hammer that is not how it works, but he said he would call Dr. Schwartz-Oscar. Dkt. No. 73 at ¶24. Cushing told Dr. Schwartz-Oscar that Hammer had a razor, threatened to cut himself, and then gave up the razor without incident. *Id.* at ¶27. Because Hammer had given up the razor without incident and without engaging in self-harm and because he had recently done well in a clinical observation placement, Dr. Schwartz-Oscar decided to authorize his placement in close observation status, where he would be observed at intervals not to exceed fifteen minutes. *Id.* at ¶¶20, 28; Dkt. No. 108 at ¶8.

Dr. Schwartz-Oscar explains that Hammer's history of self-harm was typically fairly mild. Dkt. No. 73 at ¶32. She states that, while his threats of self-harm were always taken seriously, she understood that he was calm and cooperative with no signs of acute stress. *Id.* Accordingly, she opted to place him in a less restrictive status—close observation—rather than in a more restrictive status such as constant observation or restraints. *Id.* at ¶¶20, 22, 32. Dr. Schwartz-Oscar asserts that psychological services typically moves in a stepwise fashion from least restrictive to most restrictive status in order to protect an inmate's safety within the least restrictive status possible. *Id.* at ¶30. She explains that the psychological services seeks to ensure safety and prevent further self-harm while utilizing humane means and the least restrictive status. *Id.* at ¶34. She asserts that, when she made her decision, she did not know that Hammer still had a razor, though he was known to be able to conceal razor blades. *Id.* at ¶31, 35.

After Cushing talked to Dr. Schwartz-Oscar, he directed staff to search Hammer's current cell and then place Hammer in a clinical observation cell. *Id.* at ¶36. Per policy, Hammer was strip-searched, and the clinical observation cell was searched and cleaned before Hammer was moved into it. *Id.* at ¶39. Hammer was given a security smock and a security mattress, which was the only property in the cell. *Id.* at ¶40.

At about 7:20 p.m., at Cushing's request, Nurse Wijas saw Hammer in the RHU health services examination room for a bandage change for a previous incident. *Id.* at ¶42. She evaluated the wound, applied hydrocortisone 1% for itching and a triple antibiotic ointment to prevent infection, and covered the wound with a gauze pad. *Id.* at ¶¶43-44.

Less than a half an hour later, at 7:45 p.m., M. Dedering observed Hammer standing at his front door. *Id.* at ¶48. M. Dedering says he did not see Hammer harming himself, though Hammer says he did. *Id.*; Dkt. No. 107 at ¶48; Dkt. No. 108 at ¶13. A short time later, M. Dedering radioed Williquette to check on Hammer, which he did at about 8:00 p.m. Dkt. No. 73 at ¶¶49-50. Williquette saw Hammer cutting his arm, told him to stop, and called all available staff to assist him. *Id.* at ¶50. Cushing, M. Dedering, and others responded, and M. Dedering and Williquette instructed Hammer to come to the front of his cell so they could apply restraints; Hammer complied and restraints were applied. *Id.* at ¶¶51-52. M. Dedering and Williquette removed Hammer from his cell and took him to the RHU health services unit. *Id.* at ¶53.

Nurse Wijas again saw Hammer, and he told her he bit himself because he was suicidal and hearing voices. *Id.* at ¶54. He reported that he had stopped taking his medication. *Id.* Hammer was bleeding from his left wrist and had two wounds that looked as though they had been opened by a razor. *Id.* at ¶55. Nurse Wijas treated the wounds and cleared him to return to his cell. *Id.* at ¶¶56-58.

3

Both while in health services and after being placed back in observation, Hammer says he expressed that he "would slice [his] neck open with a razor if [he] wasn't strapped down or as soon as [he] was placed in a regular cell—instead of restraints." Dkt. No. 108 at ¶¶32-33. Cushing again contacted Dr. Schwartz-Oscar to discuss the situation. Dkt. No. 73 at ¶61. They did not feel there was justification for the extreme level of restriction created by mechanical restraints. *Id.* at ¶62. Instead, Dr. Schwartz-Oscar agreed to place Hammer in constant observation status to ensure that he did not engage in further self-harm or, if he did, he would be immediately observed and stopped. *Id.* at ¶63. Constant observation requires an inmate to be constantly watched by a staff member who has a radio and an incapacitating agent to use on the inmate if he begins to act in a way that would be harmful to himself. *Id.* at ¶64.

Hammer was returned to the observation cell and placed on constant observation at about 8:35 p.m. *Id.* at ¶71. At about 9:05 p.m., Hansen, who was observing Hammer, saw Hammer turn his back toward him and directed him to turn around. *Id.* at ¶75. By the time Hansen stood up and opened the cell door trap, Hansen saw that Hammer had cut his neck. *Id.* Hansen radioed Friedel to respond with restraints and directed Hammer to place his hands out the door. *Id.* at ¶¶76-77. Hammer complied and told Hansen that he did not know where the object was that he had used to cut his neck. *Id.* at ¶77. Hammer explains that he had dropped the razor by the sink after he cut his neck. Dkt. No. 107 at ¶77. Friedel called health services, and Nurse Bost (not a defendant) responded. Dkt. No. 73 at ¶79. Hammer was escorted from his cell with gauze on his wound to the health services unit so Nurse Bost could evaluate him. *Id.*

Nurse Bost observed that Hammer's wound was about six centimeters by two centimeters and that it slowly dripped/oozed blood after the gauze was removed. *Id.* at ¶80. Hammer was alert, oriented, and talkative, and was able to turn his head from side to side as Nurse Bost took his vitals. *Id.* at ¶82. Nurse Bost dressed the neck wound and redressed the forearm/wrist wound

4

and decided Hammer should be sent to St. Vincent Hospital for further evaluation. *Id.* at ¶84. Cushing escorted Hammer to the hospital. *Id.* at ¶87.

At about 9:15 p.m., while Dr. Schwartz-Oscar was at the institution for another inmate, she was informed that Hammer had cut his neck. *Id.* at ¶89. She agreed to place him in restraints upon his return from the hospital. *Id.* at ¶90. Hammer returned to the institution at about 12:21 a.m. and was placed in restraints by Wickman, as authorized by Dr. Schwartz-Oscar. *Id.* at ¶91. Hammer received nine sutures to his neck and eleven sutures to his wrist. *Id.* at ¶92.

## LEGAL STANDARD

Summary judgment is appropriate when the moving party shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. All reasonable inferences are construed in favor of the nonmoving party. *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004). The party opposing the motion for summary judgment must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (citations omitted). "The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts." *Id*. Summary judgment is properly entered against a party "who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Parent v. Home Depot U.S.A., Inc.*, 694 F.3d 919, 922 (7th Cir. 2012) (internal quotations omitted).

## ANALYSIS

Hammer's primary claim is that several of the defendants violated his constitutional rights by failing to prevent him from harming himself. The claim is predicated on the well-established principle that deliberate indifference on the part of prison officials to serious risk of harm to inmates constitutes cruel and unusual punishment within the meaning of the Eighth Amendment. The Court's first application of this principle was in the medical context. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) ("We therefore conclude that deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." (internal citation omitted)). The reason for the rule is obvious: "An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met. In the worst cases, such a failure may actually produce physical torture or a lingering death, the evils of most immediate concern to the drafters of the Amendment." *Id.* at 103 (internal citation omitted).

The principle also applies to other risks of harm inmates can face in prison. For example, in *Farmer v. Brennan*, 511 U.S. 825, 833 (1994), the Court held that prison officials' deliberate indifference to a substantial risk of serious harm posed by other inmates can constitute cruel and unusual punishment. Again, the reason for the rule is obvious: "Having incarcerated persons with demonstrated proclivities for antisocial criminal, and often violent, conduct, having stripped them of virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course." *Id.* (internal quotation marks and brackets omitted).

In both *Estelle* and *Farmer*, it was the fact that the prisoner, by virtue of his incarceration, was deprived of his normal opportunities for protecting himself that gave rise to the duty of the prison or jail officials to act. It is easy to understand why deliberate indifference to harm from

which an inmate is unable to protect himself because of his incarceration should subject correctional officers or staff to liability for resulting harm. It is less clear, however, why correctional officers should be held liable for harm the inmate deliberately causes to himself. *See Taylor v. Wausau Underwriters Ins. Co.*, 432 F. Supp. 2d 882, 889 (E.D. Wis. 2006) ("One could reasonably argue, it seems, that denying liability for inmate suicide in the absence of evidence of mental illness or other incapacity is more consistent with the rationale underlying the deliberate indifference doctrine, and the language and history of the Eighth Amendment. To hold otherwise would also seem to be permitting a prisoner 'to engineer an Eighth Amendment violation,' something the Seventh Circuit has explicitly cautioned against." (quoting *Rodriguez v. Briley*, 403 F.3d 952, 953 (7th Cir.2005))). Such a rule can also create perverse incentives for enterprising inmates. *See Goodvine v. VandeWalle*, No. 16-C-890, 2018 WL 460121, at *7, 9 (E.D. Wis. Jan. 17, 2018) ("Goodvine admitted in the course of his testimony that he has successfully sued jail and/or correctional officers on a number of previous occasions for failing to prevent him from harming himself and related claims, and has recovered at least $25,000 in settlements with the State.").

In *Miranda v. County of Lake*, the court rejected the defendant county's challenge to the rule that its jail could be liable for failing to prevent an inmate from harming herself, explaining that incarcerated persons are "deemed incompetent." 900 F.3d 335, 349 (7th Cir. 2018). For this reason, the court held, "[w]e repeatedly have recognized a jail or prison official's failure to protect an inmate from self-harm as one way of establishing deliberate indifference to a serious medical need." *Id.* The idea that incarcerated persons are incompetent is, of course, a legal fiction. Persons suffering from severe mental illnesses that render them incompetent to stand trial or not responsible for criminal conduct are not sentenced to prison. Wis. Stat. §§971.14, 971.15. Regardless, the rule imposing liability on prison guards and staff for deliberate indifference to the

7

risk of an inmate harming himself is well-established, and it is that law on which Hammer's primary claim is based.

But while a prison official's deliberate indifference to a prisoner's substantial risk of serious self-harm violates the Eighth Amendment, not every claim by a prisoner that he did not receive adequate protection will succeed. *Phillips v. Diedrick*, No. 18-C-56, 2019 WL 318403, at *2 (E.D. Wis. Jan. 24, 2019) (citing *Estelle*, 429 U.S. at 104-05). To prevail on such a claim, a plaintiff will have to provide evidence showing that the defendants (1) were aware of an objectively serious risk of harm to him; and (2) knowingly or recklessly disregarded it. *Szopinski v. Koontz*, 832 F. App'x 449, 451 (7th Cir. 2020) (citing *Farmer*, 511 U.S. at 846).

There is no question that Hammer's self-destructive behaviors and the lacerations he made to his wrist and neck on July 3, 2017, qualify as objectively serious risks to safety and medical needs. Thus, the question before the Court is whether Hammer has presented sufficient evidence from which a jury could reasonably conclude that each Defendant consciously disregarded that risk and those needs. For the reasons explained below, the Court finds that he has not.

"Within the universe of deliberate indifference cases is a narrower category when a prisoner alleges not that his condition was ignored entirely, but that he received constitutionally deficient treatment for the condition." *Lockett v. Bonson*, 937 F.3d 1016, 1023 (7th Cir. 2019). The Seventh Circuit has "clarified that these cases are better framed 'not [as] deliberate indifference to a serious medical need,' but as a challenge to 'a deliberate decision by a doctor to treat a medical need in a particular manner.'" *Id.* (quoting *Snipes v. DeTella*, 95 F.3d 586, 591 (7th Cir. 1996)). In those cases, a court should defer to a medical or mental health professional's treatment decisions "unless no minimally competent professional would have so responded under those circumstances." *Id.* (citations and internal quotation marks omitted). It has long been held that a "[d]isagreement between a prisoner and his doctor, or even between two

8

medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." *Id.* (citations omitted). This is because "there is no single 'proper' way to practice medicine in a prison, but rather a range of acceptable courses based on prevailing standards in the field." *Id.* (quoting *Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008)).

Finally, the Seventh Circuit has clarified that "[t]he test of deliberate indifference ensures that the mere failure of the prison official to choose the best course of action does not amount to a constitutional violation." *Peate v. McCann*, 294 F.3d 879, 882 (7th Cir. 2002). "Indeed, prison officials who actually knew of a substantial risk to inmate health or safety are free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted, because in that case it cannot be said that they were deliberately indifferent." *Id.*; *see also Pulera v. Sarzant*, 966 F.3d 540, 555-56 (7th Cir. 2020) (finding response to attempted suicide was reasonable given the chaotic circumstances because "the Constitution does not demand perfection").

With this framework in mind, the Court will evaluate Hammer's claim against each of the defendants.

**1. Dr. Schwartz-Oscar**

Hammer asserts that Dr. Schwartz-Oscar demonstrated deliberate indifferent to his serious mental health needs when she declined to immediately place him in restraints and instead decided to place him on close observation and then constant observation status. Hammer argues that her decision to do so was "a substantial departure[] from accepted professional judgement, practice, or standards" and was based on "staff and institution convenience" and a desire to pursue "the easier and less efficacious treatment." Dkt. No. 106 at 9.

Dr. Schwartz-Oscar explains that, "[w]hen determining whether to authorize an inmate's placement on clinical observation status, psychologists make an effort to use the least restrictive

9

available method of restraint to meet the inmate's treatment need and, when appropriate, to restore the inmate to his maximum level of independence available." Dkt. No. 74 at ¶11. She states that, to accomplish this goal, psychological services typically moves from the least restrictive status (clinical observation) to most restrictive status (restraints) to protect an inmate's safety. *Id.* at ¶¶21, 23.

According to Dr. Schwartz-Oscar, after she was first contacted on July 3, 2017, about Hammer's threats of self-harm, she decided to place him in close observation status (fifteen-minute checks in an observation cell where Hammer would have only a smock and mattress) because she understood that he was calm and cooperative, he had given up a razor without engaging in self-harm, and he had recently done well with placement in clinical observation status. *Id.* at ¶¶20, 22. She further explains that, while he had injured himself in the past, "his history of self-harm was typically fairly mild." *Id.* at ¶22.

Following Cushing's second call, during which she learned that Hammer had cut his wrist while in close observation, Dr. Schwartz-Oscar opted to put Hammer in constant observation status (constantly watched by a staff member with a radio and incapacitating agent). She explains that she considered Hammer's patient history, including that he had been successful in the past in constant observation. While acknowledging that Hammer has a history of hiding razor blades, she did not believe he had one any longer because she understood that he and his cell had been searched prior to Hammer being placed back in his cell for constant observation. *Id.* at ¶35. She concedes that behavior is unpredictable, but based on her consultation with Cushing, who reported his observations of Hammer's behavior, she believed constant observation was the best option. She emphasizes that her "priority is to protect the inmate's safety and honor his humanity." *Id.* at ¶31.

No jury could reasonably conclude that Dr. Schwartz-Oscar was deliberately indifferent to Hammer's threats and acts of self-harm. While it is true that the course of treatment she pursued

10

failed to prevent Hammer from harming himself, the success of her treatment decision is not determinative. Dr. Schwartz-Oscar articulated the competing priorities she considered—keeping Hammer safe and honoring his humanity—as well as the factors she considered in making her treatment decision—Cushing's observations of Hammer's behavior, the fact that Hammer had initially voluntarily given up a razor, Hammer's past responses to treatment, and her belief that he no longer possessed a razor. Based on the information she had at the time, she made her decision to place Hammer on constant observation rather than in restraints. This is a perfect example of a health professional making a deliberate decision in very difficult circumstances. In hindsight it may be possible to conclude that she failed to choose the *best* course of action, but her failure to do so does not amount to a constitutional violation.

Hammer argues that her decision "substantially departed from professional standards" yet he provides no evidence rebutting Dr. Schwartz-Oscar's articulation of the standard or evidence defining what he asserts the standard to be. He appears to believe that, because he made a specific threat that he would cut his neck, Dr. Schwartz-Oscar was required to accede to his demand to be placed in restraints. But Dr. Schwartz-Oscar explains that a specific plan to harm oneself is only one of many factors to be considered when deciding whether to place an inmate in restraints. *See* Dkt. No. ¶29. Hammer also asserts that Dr. Schwartz-Oscar impermissibly deferred to the institution's policy to use "the least restrictive means possible," but he offers no evidence to suggest that this policy conflicts with accepted professional standards. And, in any event, the use of the word "possible" means the policy does not mandate a particular outcome; instead, it empowers staff to use their judgment to determine what "the least restrictive means" is depending on the circumstances. Again, the evidence shows that, after weighing all the factors, Dr. Schwartz-Oscar made a deliberate treatment decision, and neither Hammer's disagreement with her decision

11

nor the fact that her decision failed to prevent Hammer from harming himself is sufficient to create a triable issue regarding her state of mind.

Hammer's argument that Dr. Schwartz-Oscar's decision was based on "staff and institution convenience" and a desire to pursue "the easier and less efficacious treatment" also fails. It is far from clear that removing an officer from his scheduled duties and posting him outside a single inmate's cell to keep constant watch over him is more convenient and less costly than restraining an inmate. The more convenient and easier decision would have been to simply strap Hammer to a bed and check on him periodically. However, the use of bed restraints also raises Eighth Amendment concerns. If restrained for a long period of time, an inmate may suffer serious physical and psychological harm. *See, e.g.*, *Wells v. Franzen*, 777 F.2d 1258, 1261-62 (7th Cir. 1985). It was therefore not unreasonable for Dr. Schwartz-Oscar to opt for constant supervision over bed restraints with the understanding that he no longer had access to any sharp instrument with which to harm himself. In any event, rather than immediately going to the extreme of bodily restraints, Dr. Schwartz-Oscar opted to progressively restrict Hammer's freedom in the hope of ensuring his long-term safety. She may have erred in her judgment, but no jury could conclude such a decision demonstrates deliberate indifference.

Finally, Hammer argues that Dr. Schwartz-Oscar's decision to place him in restraints after he returned from the hospital was motivated by spite rather than a concern to keep him safe. Dkt. No. 107 at ¶90. This argument suggests that Hammer was going to disagree with any decision Dr. Schwartz-Oscar made regardless of how well reasoned it was. If so, Dr. Schwartz-Oscar was in a no-win situation. Hammer was intent on suing her whether she placed him in restraints or not. As Hammer seems to know well, the heavy duty placed on prison officials to protect inmates from harming themselves can be used to manipulate prison staff. *See Bowers v. Pollard*, 602 F. Supp. 2d 977, 993 (E.D. Wis. 2009), *aff'd* 345 F. App'x 191 (7th Cir. 2009) (likening self-harming

12

prisoner to both hostage and hostage taker with guards in impossible position of negotiating with one to save the other). It also has a tendency to monopolize prison staff who must form extraction teams to enter cells and rescue a prisoner from himself to the neglect of other important duties they have to meet other inmates' needs. In any event, threatening self-harm does not entitle a prison inmate to dictate to an experienced psychologist the steps that must be taken to keep him safe and avoid liability. Under the Eighth Amendment, Hammer is not entitled to demand specific care, nor is he entitled to the best care possible. He "is entitled to reasonable measures to meet a substantial risk of serious harm" to him, and that is precisely what he received from Dr. Schwartz-Oscar. *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997). She is entitled to summary judgment on this claim.

### 2. Lieutenant Cushing

Hammer asserts that Cushing demonstrated deliberate indifference to his personal safety because he knew the razor Hammer had used to injure himself while on close observation had not been confiscated, he failed to inform Dr. Schwartz-Oscar of all the relevant circumstances, and he deferred to her decision to place Hammer in constant and close observation. Cushing explains that, after Hammer first showed officers a razor and expressed a desire to die, he met with Hammer in a conference room and then called Dr. Schwartz-Oscar to discuss Hammer's request to be placed in restraints. On that occasion, Hammer had voluntarily relinquished his razor. As noted above, Dr. Schwartz-Oscar decided to put Hammer in close observation because she believed he could keep himself safe if staff checked on him at least every fifteen minutes. Dkt. No. 75 at ¶13. Cushing explained that, after making threats to harm himself, Hammer would only sometimes carry through on his threats. *Id.* at ¶15. Hammer's cell and the observation cell were searched, and Hammer was strip-searched before he was placed on close observation. *Id.* at ¶¶14, 17. After Hammer cut his arm while on close observation, Cushing again called Dr. Schwartz-Oscar. He

13

explains that he agreed with Dr. Schwartz-Oscar's decision to place Hammer on constant observation because there was not "a justification for such an extreme level of restriction as GRIPP bed restraints." *Id.* at ¶24. Cushing also explains that Hammer had recently been on constant observation, and it had been effective in keeping him safe following threats of self-harm. *Id.* at ¶26. Apparently, Hammer had secreted a razor where guards did not find it. After Hammer cut his neck and a nurse found he needed to go to the hospital, Cushing contacted the warden and asked if a supervisor could accompany him; Cushing then escorted Hammer to the hospital. *Id.* at ¶¶30-31.

No jury could reasonably conclude that Cushing's prompt response to Hammer's self-destructive behavior and his deference to Dr. Schwartz-Oscar's treatment decisions demonstrate deliberate indifference. The Seventh Circuit has explained that nonmedical professionals are entitled to defer to the judgment of health professionals so long as they do not ignore a prisoner. *See Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010). The undisputed facts show that Cushing met this standard. After Hammer first revealed (and turned over) a razor, Cushing took the time to pull Hammer out of his cell into a separate room to better understand his needs. He then promptly called Dr. Schwartz-Oscar to get her input on how to proceed. Again, after Hammer cut himself, he immediately contacted Dr. Schwartz-Oscar and implemented her decision. The Court has already found that her decision not to immediately restrain Hammer did not violate the Constitution, so Cushing's decision to defer to that decision also did not violate the Constitution.

The exception to the rule allowing nonmedical professionals to defer to the expertise of medical professionals is when a nonmedical professional has reason to believe or actual knowledge that the medical professional is mistreating the prisoner. *McGee v. Adams*, 721 F.3d 474, 483 (7th Cir. 2013). Cushing asserts that he agreed with Dr. Schwartz-Oscar's decision that the extreme restriction of restraints was not justified, undercutting any argument that he believed she was

14

mistreating Hammer. Hammer asserts, without any evidence, that Cushing knew Dr. Schwartz-Oscar's decision was wrong because he did not convey the relevant details to her and thereby deprived her of the ability to make a fully informed decision. But there is no evidentiary basis in the record to support Hammer's speculation that Cushing left out key details or mischaracterized Hammer's condition when conferring with Dr. Schwartz-Oscar. *See Montgomery v. Am. Airlines, Inc.*, 626 F.3d 382, 389 (7th Cir. 2010) ("[U]ncorroborated, self-serving testimony, if based on personal knowledge or firsthand experience, may prevent summary judgment . . . . But mere conclusory allegations do not constitute evidence." (internal citations omitted)). Hammer also fails to provide any evidence that Cushing knew the razor was still in Hammer's cell after he cut his wrist. Instead, the evidence shows that the cell was searched each time before Hammer was placed in it. It was Hammer's apparent skill in hiding such contraband that prevented the guards from finding it. Based on this record, no jury could conclude that Cushing was deliberately indifferent to Hammer's needs when he deferred to Dr. Schwartz-Oscar's treatment decisions. Cushing is entitled to summary judgment.

### 3. Nurse Wijas

In his amended complaint, Hammer asserted that Nurse Wijas was deliberately indifferent to the cuts he made to his wrist because she opted to bandage them rather than send him to the hospital for sutures. He points out that the nurse who later treated his neck injury rebandaged his wrist injury, and he ended up receiving eleven sutures to his wrist (and nine sutures to his neck) at the hospital. Nurse Wijas asserts that, after Hammer came to health services, she cleaned the injury with normal saline and applied a steri-strip adhesive skin closure strip and covered the injury with a Tegaderm waterproof transparent dressing. Dkt. No. 78 at ¶16.

Hammer appears to have abandoned this claim. In his response to Defendants' motion, he asserts only that "all other defendants" other than Dr. Schwartz-Oscar, Cushing, and M. Dedering

"should be held liable because they acted by trying to cover up their colleagues['] acts, which is a species of tort."  Dkt. No. 106 at 12.  However, even if he had pursued this claim, there is no evidence from which a jury could conclude that Nurse Wijas was deliberately indifferent to Hammer's medical needs.  Just because hospital staff chose to treat Hammer's wrist injury with sutures does not mean that sutures were required.  And, as already explained, a disagreement between two medical professionals about the proper course of treatment is insufficient, by itself, to establish an Eighth Amendment violation.  Even if it was eventually determined that sutures were the better or even best course of treatment, Nurse Wijas attempting the more conservative treatment of cleaning the wound and applying a steri-strip bandage onsite rather than sending Hammer offsite for sutures does not demonstrate that she was deliberately indifferent to his injuries.  *See Jackson v. Kotter*, 541 F. App'x 688, 698 (7th Cir. 2008) ("There is not one 'proper' way to practice medicine in prison, but rather a range of acceptable courses based on prevailing standards in the field.").  She is entitled to summary judgment on this claim.

### 4. M. Dedering

Hammer asserts that M. Dedering demonstrated deliberate indifference when he saw him in the act of cutting himself and merely shrugged his shoulders and walked away.  According to M. Dedering's notation on the observation log, he observed Hammer at 7:45 p.m. "standing at the door."  Neither Hammer nor Dedering assert that they spoke to one another at this time.  Dedering also verified under penalty of perjury that he "did not witness Hammer actively self-harming."  Dkt. No. 76-2 at ¶2.  Although Hammer may have been self-harming at the time Dedering completed his observation check, he has no knowledge of what Dedering was able to see and he presents no evidence supporting a conclusion that he informed Dedering of what he was doing.  Because Hammer has not presented any evidence from which a jury could reasonably conclude that Dedering had actual knowledge of Hammer's efforts to harm himself, Dedering is not liable

for failing to interrupt or stop those efforts. *See Washington v. LaPorte County Sheriff's Dep't*, 306 F.3d 515, 518 (7th Cir. 2002) ("The key is that the individuals must have *actual* knowledge of the risk." (citations omitted)). M. Dedering is entitled to summary judgment.

### 5. Remaining Officers

The remaining officers—Friedel, D. Dedering, Williquette, and Hanson—had limited contact with Hammer. They responded to calls for help to remove Hammer from his cell and/or completed observation checks as Hammer's observation status required. Hammer presents no evidence suggesting that any of them had the authority to override Dr. Schwartz-Oscar or Cushing's decisions or that they had any reason to question their decisions. Hammer argues that "they acted by trying to cover up their colleagues['] acts," Dkt. No. 106 at 12, but he provides no evidence supporting his conclusory allegations of a coverup. In any event, the Court has determined that Dr. Schwartz-Oscar, Cushing, Nurse Wijas, and M. Dedering did not violate the Constitution, so there was nothing for the remaining Defendants to cover up. They are entitled to summary judgment.

## STATE LAW CLAIMS

Hammer has abandoned his state-law claims against Dr. Schwartz-Oscar and Nurse Wijas. But, even if he had not, those claims would be dismissed. Neither Dr. Schwartz-Oscar nor nurse Wijas are amenable to medical malpractice claims in Wisconsin because neither is a "health care provider," *i.e.*, a "physician" or "nurse anesthetist." *See* Wis. Stat. §§655.001-655.002; *Patients Compensation Fund v. Lutheran Hosp.-La Crosse, Inc.*, 216 Wis. 2d 49, 55-56 (Ct. App. 1997). Further, while they could be sued for negligence, Hammer admits that he did not serve a notice of claim as required by Wis. Stat. §893.82(5m). Accordingly, these claims must be dismissed.

## MOTION TO APPOINT COUNSEL

On March 12, 2021, Hammer filed a motion to recruit counsel to represent him at trial. Dkt. No. 111. Magistrate Judge Duffin issued at least two decisions denying previous motions Hammer filed for the recruitment of counsel. Dkt. Nos. 29, 68. Both decisions properly assessed both the complexity of the case and Hammer's competence to litigate the claims asserted. The Court has now determined that none of his claims survive summary judgment, so the Court will deny his current motion as moot.

## CONCLUSION

This case began with Hammer showing officers a razor and indicating he needed help because he was having urges to kill himself. The officers did not ignore Hammer or disregard his threat. They immediately took steps to protect him from himself. He complied with orders to drop the razor and, shortly thereafter in an effort to keep him safe, officers placed him in a new cell with extremely limited property. It is not clear to the Court how Hammer managed to obtain a razor in his new cell—he, his old cell, and his new cell were all searched. Maybe officers did a poor job searching the new cell, but more likely given Hammer's history of hiding razors, Hammer brought the razor with him. After he cut his wrist, Hammer says he dropped the razor by the sink, but if he simply dropped the razor where he stood, the Court questions why officers did not find it before returning him to the cell. Importantly, Hammer never told anyone he had a razor before or after he cut his wrist. In fact, he told the nurse he bit himself. Despite the officers' failure to locate the razor, Hammer was able to quickly locate it under the corner of his cell door. He then turned his back to the officer watching him and again cut himself. How it ended up under the cell door and how Hammer knew it was there is not in the record, but the Court can guess.

Regardless, it is clear from the undisputed evidence that Hammer's rights under the Eighth Amendment were not violated. Not only were the defendants not deliberately indifferent to the

18

Case 1:19-cv-00444-WCG   Filed 03/31/21   Page 18 of 19   Document 115

threat Hammer posed to himself and the injuries he inflicted upon himself, they exhibited every effort to protect him. Their efforts, even if not successful, reflect not indifference but tremendous concern for Hammer's care and safety, far more than he had for himself. Indeed, "[i]t is difficult to imagine any institution on earth, penal or not, that could or would be expected to expend as much time, effort and resources to protect a person from himself." *Bowers*, 602 F. Supp. 2d at 993.

**IT IS THEREFORE ORDERED** that Plaintiff's motion to recruit counsel (Dkt. No. 111) is **DENIED as moot**, Defendants' motion for summary judgment (Dkt. No. 71) is **GRANTED**, and this case is **DISMISSED**. The Clerk is directed to enter judgment accordingly.

Dated at Green Bay, Wisconsin this 31st day of March, 2021.

s/ William C. Griesbach
William C. Griesbach
United States District Judge

---

This order and the judgment to follow are final. Plaintiff may appeal this Court's decision to the Court of Appeals for the Seventh Circuit by filing in this Court a notice of appeal within **30 days** of the entry of judgment. *See* Fed. R. App. P. 3, 4. This Court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. *See* Fed. R. App. P. 4(a)(5)(A). If Plaintiff appeals, he will be liable for the $505.00 appellate filing fee regardless of the appeal's outcome. If Plaintiff seeks leave to proceed *in forma pauperis* on appeal, he must file a motion for leave to proceed *in forma pauperis* with this Court. *See* Fed. R. App. P. 24(a)(1). Plaintiff may be assessed another "strike" by the Court of Appeals if his appeal is found to be non-meritorious. *See* 28 U.S.C. §1915(g). If Plaintiff accumulates three strikes, he will not be able to file an action in federal court (except as a petition for habeas corpus relief) without prepaying the filing fee unless he demonstrates that he is in imminent danger of serous physical injury. *Id.*

Under certain circumstances, a party may ask this Court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of judgment. The Court cannot extend these deadlines. *See* Fed. R. Civ. P. 6(b)(2).

A party is expected to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.